IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SEBAHATE PILICI,          )
          )
   Plaintiff,          )
          )
   v.          )
          )
DEKALB COUNTY, GEORGIA,          )
JASON DANIELS,          )
KEITH BYRD,          )
LISA GUEST,          )
          )
   Defendants.          )

## **COMPLAINT**

Arben Pilici needed to go to a routine doctor's appointment to renew his mental health prescriptions. But he did not want to go, and unable to convince him, his family asked DeKalb County for help. Instead of help, DeKalb County's Mobile Crisis Unit accelerated a welfare check into a crisis that ended in Mr. Pilici's death at age forty-nine. That crisis began when Officer Jason Daniels pinned Mr. Pilici face-down on the floor and pressed his 270-pound frame against Mr. Pilici's back and his forearm across Mr. Pilici's neck for more than eight minutes. That use of force left Mr. Pilici struggling to breathe and barely able to stand. Daniels and Officer Keith Byrd then handcuffed Mr. Pilici and loaded him, face down, into the back of a patrol car. The officers and social worker, Lisa Guest,

remained nearby, but ignored Mr. Pilici for the next 15 minutes as he suffocated in the back seat of the patrol car. Despite clear warning signs that he could not breathe and was becoming non-responsive—and despite their basic life-saving training and decades of well-known guidance about the deadly risks of prone restraint and positional asphyxia—no one intervened. Now, Mr. Pilici's mother, Sebahate Pilici, brings this action under 42 U.S.C. § 1983 and Georgia law.

### Allegations common to all counts

1.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

2.  Venue is proper in this district under 28 U.S.C. § 1391(b) because this is the district where Defendants reside and where the claims arose.

3.  Plaintiff Sebahate Pilici is the mother of Arben Pilici and a resident of the State of Georgia. Because Mr. Pilici died as an unmarried adult without children, Ms. Pilici is the holder of the wrongful death claim under Georgia law.

4.  Arben Pilici lived with his family in Stone Mountain, Georgia.

5.  Mr. Pilici and his family immigrated to the United States from Kosovo years ago. At the time of his death, Mr. Pilici was forty-nine years old.



6.    Mr. Pilici struggled with mental illness for most of his life but had a close

relationship with his family. The following photograph shows Mr. Pilici

along with members of his family on the night before his death.



7.    To treat his mental illness, Mr. Pilici had regular doctor appointments to manage his prescription medications.

8.    These appointments often triggered Mr. Pilici's fear of doctors and he would refuse to go.

9.    Mr. Pilici's family sometimes struggled to help him manage his doctor's appointments but they were generally successful in managing Mr. Pilici's fear of doctors and medical treatments.

10.    On February 9, 2024, as a result of Mr. Pilici's refusal to go see his doctor, his sister called the police for help.

11.    Later that morning, two officers came to the Pilici home and met with Mr. Pilici. Mr. Pilici was in good spirits and resting on the couch when they arrived.

12. The officers asked Mr. Pilici if he wanted to go to the doctor, but he said no.

13. Because Mr. Pilici was not displaying behaviors of self-harm or that suggested he was a risk to others, the officers told his family they could not involuntarily take Mr. Pilici to his doctor's appointment.

14. Later that morning, a doctor with Claratel, Domonic Hill, sent a request to the Mobile Crisis Unit (MCU) to conduct a follow up wellness check for Mr. Pilici.

15. Dr. Hill's request said Mr. Pilici had not been violent and was not under the influence of alcohol or drugs.

16. Dr. Hill noted that Mr. Pilici's sister was concerned because Mr. Pilici had "made threats" because he did not want to go to the doctor but did not specify what type of threat had been made nor did the message specify whether the threat involved the threat of harm to any person.

17. The MCU is a partnership between Claratel Behavioral Health and the DeKalb County Police Department.

18. The unit pairs a licensed counselor with a police officer to evaluate individuals experiencing a mental health crisis and, if necessary, to intervene.

19. The MCU's goal is to deescalate acute crises and provide immediate therapeutic interventions to avoid unnecessary hospitalizations and arrests.

20. At all times relevant to this complaint, Defendant Jason Daniels was a police officer employed by the DeKalb County Police Department.

21. At all times relevant this complaint, Defendant Lisa Guest was a licensed practical counselor employed by the non-profit Claratel Behavioral Health and on assignment with the DeKalb County Police Department's Mobile Crisis Unit.

22. Claratel Behavioral Health is the name used by the DeKalb County Community Service Board, a statutory, public non-profit.

23. Defendants Lisa Guest and Jason Daniels were assigned to the MCU on February 10, 2024.

24. Defendant Guest's role in the MCU was to evaluate individuals and the alleged crisis situation and to deescalate potentially dangerous situations.

25. Defendant Daniels was a police officer assigned to the MCU. His role was to ensure the safety of the public, the individual, and of the counselor responding to the scene with him.

26. On February 9, 2024, Defendant Guest received Dr. Hill's email requesting a follow-up welfare check.

27.   Defendants Daniels and Guest arrived at the Pilici home to conduct a follow-up welfare check on February 10, 2024, at about 4:30 p.m.

28.   As Defendants approached the house, they first encountered Mr. Pilici's brother, Bardhyl Pilici, who met them outside of the house.

29.   Defendants explained that they had received a call from Mr. Pilici's sister and asked Bardhyl if Mr. Pilici would be willing to speak with them.

30.   Bardhyl went into the house, spoke with Mr. Pilici, and then returned and reported that Mr. Pilici did not want to talk to Daniels or Guest.

31.   Defendant Guest then spoke briefly with Mr. Pilici's mother, and Defendant Daniels asked Bardhyl to lead him to Mr. Pilici inside the house.

32.   Defendant Guest remained near the front door while Defendant Daniels followed Bardhyl into the house.

33.   When Defendant Daniels encountered Mr. Pilici, Mr. Pilici was sitting quietly on a chair, while drinking tea and smoking a cigarette.

34.   When Defendant Daniels introduced himself, Mr. Pilici said hello.

35.   Defendant Daniels then explained he was from the Mobile Crisis Unit.

36.   Mr. Pilici responded by speaking in Albanian.

37.   At that point, Defendant Daniels understood that Mr. Pilici did not speak English fluently and was not able to communicate effectively.

38. Mr. Pilici was calm to this point, and his limited responses indicated only that he did not want any police or medical intervention.

39. Defendant Daniels then told Defendant Guest to enter the room to speak with Mr. Pilici.

40. When Defendant Daniels called Defendant Guest into the room, Mr. Pilici stood, gestured with his arm, and told Defendants Daniels and Guest to go.

41. Mr. Pilici calmed down and sat again but continued to gesture to Defendants Daniels and Guest to leave.

42. Defendant Guest saw Mr. Pilici standing, gesturing, and speaking in Albanian.

43. Defendant Guest understood that Mr. Pilici did not speak English fluently.

44. Defendant Guest did not understand what Mr. Pilici was saying, but she understood from his gestures and tone that Mr. Pilici did not wish to speak with her.

45. After Mr. Pilici had resumed sitting and had visibly calmed down, Defendant Guest told Defendant Daniels that Mr. Pilici was going to be involuntarily committed.

46. Defendant Daniels instructed Mr. Pilici's brother, Bardhyl, to explain to Mr. Pilici that Defendants were going to take Mr. Pilici to the hospital.

47. Defendant Daniels then brandished his handcuffs and repeatedly told Mr. Pilici, "You've got to go" and asked, "You want to put these on?"

48. Mr. Pilici continued gesturing for Defendant Daniels to leave.

49. Mr. Pilici understood that Defendant Daniels was threatening to remove him from the house by force. Mr. Pilici then began yelling in Albanian and continued gesturing to Defendant Daniels to leave the home.

50. Defendant Daniels continued to indicate to Mr. Pilici that he was going to be placed in handcuffs.

51. This repeated threat upset Mr. Pilici, who stood and continued yelling in Albanian.

52. Bardhyl attempted to calm Mr. Pilici, but Mr. Pilici pushed him away.

53. Defendant Daniels then approached Mr. Pilici, and Mr. Pilici likewise pushed him away.

54. Bardhyl stood between Mr. Pilici and Defendant Daniels to deescalate the situation.

55. Mr. Pilici continued to physically resist Defendant Daniels' advances toward him, and Bardhyl continued trying to calm Mr. Pilici.

56. Defendant Daniels called dispatch and said that he needed assistance because Mr. Pilici was uncooperative and asked dispatch to start a "10-52,"

or call an ambulance, to send Mr. Pilici to the hospital for an evaluation of his mental health.

57.    Defendant Daniels did not regard Mr. Pilici as a physical threat to him or to Bardhyl. Defendant Daniels was substantially stronger than Mr. Pilici, and in spite of Mr. Pilici pushing at both Defendant Daniels and Bardhyl, it was obvious that Mr. Pilici was not a physical threat and could not overpower either his brother or Defendant Daniels.

58.    Defendant Daniels continued to approach Mr. Pilici, who continued to gesture and yell for Daniels to get out. Bardhyl continued to stand between Mr. Pilici and Defendant Daniels.

59.    Mr. Pilici struggled with Bardhyl and the two collided into Defendant Daniels.

60.    Defendant Daniels then took Mr. Pilici down to the ground.

61.    Defendant Daniels placed Mr. Pilici face-down, pinning his arms underneath his body.

62.    While Mr. Pilici was pinned to the ground, Defendant Daniels placed his full weight on Mr. Pilici's back.

63.    At the time, Defendant Daniels weighed approximately 270 pounds.

64.  Defendant Daniels also leveraged his considerable weight by placing his
     forearm on Mr. Pilici's neck.

65.  Defendant Daniels continued to pin Mr. Pilici face down on the ground for
     over eight minutes.

66.  During those eight minutes, Defendant Daniels did not release the pressure
     on Mr. Pilici to ensure he could breathe or do anything to check on Mr.
     Pilici's safety despite knowing that restraining Mr. Pilici face down would
     lead to asphyxiation.

67.  At first, Mr. Pilici cried out to his family for help.

68.  During that time, Mr. Pilici struggled to free himself, but was unable to do
     so.

69.  The pressure applied by Daniels was so intense that it altered Mr. Pilici's
     voice and restricted his ability to breathe.

70.  After about five minutes, Defendant Daniels called his sergeant over the
     radio to let other officers know he was "10-4" or okay. At the point Daniels
     called over the radio, Daniels was calm and had Mr. Pilici fully restrained.
     Daniels knew that no one in the house presented a threat to him, and that
     members of Mr. Pilici's family only attempted to deescalate or otherwise
     assist him.

71. After about six minutes, Mr. Pilici stopped moving around and could no longer cry out for help.

72. Nevertheless, Defendant Daniels continued applying pressure, holding Mr. Pilici in a compromised position, and knowing the entire time that Mr. Pilici was struggling to breathe and could not move.

73. Defendant Guest heard Mr. Pilici struggling to breathe and saw that Defendant Daniels continued restraining Mr. Pilici after he had stopped moving.

74. Defendant Byrd arrived at the Pilici home while Defendant Daniels had Mr. Pilici pinned to the ground.

75. By the time Defendant Byrd arrived, Mr. Pilici's breathing had become labored, and Mr. Pilici was not moving.

76. At all times relevant to the events in this complaint, Defendant Keith Byrd was a police officer employed by the DeKalb County Police Department.

77. After Defendant Byrd arrived, Defendant Daniels stood up, and he and Byrd finished handcuffing Mr. Pilici behind the back.

78. By the time Mr. Pilici was handcuffed, he was not resisting in any way.

79. Defendants Daniels and Byrd lifted Mr. Pilici under the armpits. At that point, Mr. Pilici could not stand under his own power. The officers had to continue to hold him up while pushing and pulling him to the front door.

80. Mr. Pilici was audibly struggling to breathe and could not speak.

81. Mr. Pilici's labored breathing was audible to Defendants Daniels, Byrd, and Guest as the officers took Mr. Pilici out of the house by hoisting Mr. Pilici by his armpits.

82. Defendants Daniels and Byrd bore most of Mr. Pilici's weight as they walked him through the house.

83. When Defendants Byrd and Daniels reached the steps at the front door of the house, Mr. Pilici collapsed to the ground.

84. As Mr. Pilici was kneeling on the ground with his arms lifted behind him by the officers, his labored breathing was apparent. Mr. Pilici's only movement was to raise his head slightly as he inhaled. He otherwise did not resist the officers in any way, nor did he say anything.

85. Defendants Byrd and Daniels lifted Mr. Pilici back to a standing position and continued to carry Mr. Pilici to Defendant Daniels' patrol car.

86. As they arrived at the patrol car, Defendant Daniels began clearing a space in the back seat for Mr. Pilici. When Defendant Daniels released his grip on

Mr. Pilici, Mr. Pilici slumped against the side of the patrol car because he could not stand under his own power.

87. Defendant Byrd and Defendant Daniels then hoisted Mr. Pilici up and rolled him into the back seat of the vehicle.

88. Throughout the entire time that Mr. Pilici was in handcuffs and being loaded into the patrol car, Defendants Byrd, Daniels, and Guest all heard Mr. Pilici's labored breathing, and observed that he was no longer responsive to anything happening around him.

89. Defendant Daniels then moved to the opposite door and pulled Mr. Pilici across the back seat.

90. Defendants Daniels and Byrd positioned Mr. Pilici on his stomach with his hands handcuffed behind his back.

91. Defendant Daniels then closed the rear driver's side door, and as he did so, it struck the top of Mr. Pilici's head. The door did not close fully, so Defendant Daniels closed the door harder, again striking the top of Mr. Pilici's head.

92. Despite being unexpectedly struck twice on the top his head by a car door while laying across the car seat, Mr. Pilici did not physically or audibly respond.

93. Defendant Byrd saw the door slam into Mr. Pilici's head and saw that Mr. Pilici did not react to the blow.

94. Instead of checking to ensure that Mr. Pilici was breathing and in a safe position, Defendant Byrd folded Mr. Pilici's legs upward and closed the car door, effectively placing Mr. Pilici in a hog tie position.

95. Defendants Byrd, Daniels, and Guest each knew that Mr. Pilici was lying face down in the back seat of the patrol car, that Mr. Pilici's hands were cuffed behind his back, that Mr. Pilici was non-responsive, that Mr. Pilici's breathing was labored, and that Mr. Pilici's face was pressed into the car seat.

96. After closing the doors to the patrol car, Defendants Daniels and Byrd spoke outside of the patrol car in which Mr. Pilici was detained. They joked about having to go "hands on" with other individuals in need of mental health services and confirmed with dispatch that all officers were "10-4." They also complained about how long the City of Clarkston police took to respond to Defendant Daniels' earlier radio call.

97. During that conversation, Defendant Daniels explained that he is a "good 270" pounds and that he was "trying to put [his] weight on" Mr. Pilici. Daniels laughed as he narrated that, during the eight minutes that Mr. Pilici

was being crushed under his weight, that "he's struggling, he's struggling, he's struggling."

98. During this conversation, Defendant Guest was seated in the front seat of the patrol car in which Mr. Pilici was detained.

99. As Defendants Daniels, Byrd, and Guest spent the next 15 minutes joking and laughing, none of them checked on Mr. Pilici in the backseat of the patrol car. None of them looked through the window, opened the door, or even attempted to speak to Mr. Pilici.

100. If any of them looked into the backseat, they would have seen that Mr. Pilici had not moved, that his breathing was restricted due to his positioning and that Mr. Pilici was in dire need of emergency medical treatment.

101. No one checked on Mr. Pilici until EMS arrived approximately 15 minutes after Mr. Pilici was placed in the patrol car.

102. Mr. Pilici later died as a result of being deprived of oxygen during the time he was in the back of Defendant Daniel's patrol car.

<u>Count I</u>

103. This count is alleged against Defendant Daniels in his individual capacity under 42 U.S.C. § 1983 and the Fourth Amendment of the United States

Constitution for excessive force. This count incorporates all previous factual allegations.

104. Defendant Daniels use of force to restrain Mr. Pilici involved Daniels' placing his entire body weight—approximately 270 pounds—on Mr. Pilici's chest as Mr. Pilici was restrained in a prone position.

105. Defendant Daniels also placed his forearm on the neck of Mr. Pilici which further restricted Mr. Pilici's ability to breathe.

106. Defendant Daniels continued to apply his full weight to Mr. Pilici even after Mr. Pilici's ability to breathe diminished, Mr. Pilici started struggling to breathe, and after Mr. Pilici had ceased any initial resistance.

<u>Count II</u>

107. This count is alleged against Defendant Daniels and Byrd in their individual capacities under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution for deliberate indifference to Mr. Pilici's medical emergency. This count incorporates paragraphs 1 through 102.

108. At the time that Mr. Pilici was placed in handcuffs, Defendants Daniels and Byrd knew that Mr. Pilici had difficulty breathing, could not walk under his own power, and was becoming increasingly non-responsive.

109. At the time that Mr. Pilici was placed in handcuffs, Defendant Daniels knew that, for the previous eight minutes, Daniels had pinned Mr. Pilici to the ground and intentionally used his weight to restrain Mr. Pilici as much as possible, including by placing his forearm across Mr. Pilici's neck.

110. At the time that Mr. Pilici was in handcuffs, Defendant Daniels knew that Mr. Pilici had gone from being talkative and animated to non-responsive and had watched Mr. Pilici's condition deteriorate beginning with the eight-minute restraint and continuing from that point forward.

111. Defendant Byrd knew that Daniels had engaged in a struggle with Mr. Pilici, had placed his weight on top of Mr. Pilici, and that Defendant Daniels had remained in that position from the time of his initial call for backup until Defendant Byrd's arrival.

112. Defendants Byrd and Daniels knew at the time they placed Mr. Pilici in the backseat of the patrol car that Mr. Pilici was non-responsive and unable to move under his own power.

113. Defendants Byrd and Daniels knew that Mr. Pilici needed immediate medical aid.

114. Defendants Daniels and Byrd knew that EMS had been summoned to the scene to take Mr. Pilici to the hospital for an evaluation, and that EMS was not called to respond to a medical emergency.

115. Defendants Daniels and Byrd did not attempt to initiate an emergency EMS call and instead loaded Mr. Pilici into the back of Defendant Daniels' vehicle.

116. As Defendants Byrd and Daniels began loading Mr. Pilici in the back of the patrol car, they recognized that Mr. Pilici was in medical distress due to his non-responsiveness and labored breathing.

117. Defendants Byrd and Daniels then completely ignored Mr. Pilici for the next 15 minutes, without checking on his status, ensuring that he was breathing, ensuring that he had not remained in a position that compromised his ability to breathe, and without calling for any emergency medical treatment.

118. Defendants Byrd and Daniels are trained in basic life support techniques, which include cardiopulmonary resuscitation, the use of an automated external defibrillator, airway and breathing support, and recognizing respiratory distress.

119. Any of these measures, if employed, would have enabled Mr. Pilici's survival.

120. During those 15 minutes, Defendants Byrd and Daniels had no other duties to tend to, no exigencies, and no risk to their safety. Instead, Defendants Byrd and Daniels stood just outside of the patrol car, joking, laughing, and engaging in small talk, as Mr. Pilici suffocated.

<u>Count III</u>

121. This count is against Defendant DeKalb County under 42 U.S.C. § 1983 for its failure to train officers concerning the use of prone restraint, compressional asphyxiation, and its attendant risk of death. It incorporates paragraphs 1 to 102, and 107 to 120.

122. Positional asphyxiation, also called compression asphyxia, is a form of asphyxia in which a person's body position and/or external compression applied while the person is restrained interferes with the ability to breathe, including by preventing full chest expansion or impairing ventilation during prone (face-down) restraint.

123. In Georgia, there is a recurring pattern of restraint-associated deaths in which prone positioning, delayed repositioning after handcuffing, and continued compression were present. One statewide investigation found at

least 31 deaths in Georgia from 2014 to 2024 following restraint by law enforcement.

124. As part of its training curriculum for newly certified police officers, Georgia provides minimal training on positional asphyxiation. This means that additional training must be provided by county and municipal law enforcement agencies.

125. DeKalb County has had prior incidents of death resulting from positional asphyxiation, including the 2019 death of Jamon West. Mr. West died after being handcuffed behind his back and put in a prone position by DeKalb County law enforcement officers.

126. DeKalb County investigated the conduct that led to Mr. West's death and determined that officers did not violate County policy, including by placing Mr. West in a prone position while handcuffed behind his back.

127. The deadly risk of prone restraint has been well-established for decades. For example, in 1995 the United States Department of Justice issued a bulletin specifically concerning positional asphyxia and specifically promoted policy guidelines including: (a) as soon as a suspect is handcuffed, getting the suspect off of their stomach; and (b) provide training to recognize breathing difficulties or loss of consciousness.

128. The risk of compression asphyxia was the subject of national attention following the death of George Floyd in 2020 and the criminal prosecution of former police officer Derek Chauvin, who caused Mr. Floyd's death by asphyxiation by kneeling on him for over nine minutes.

129. Against that known risk environment, DeKalb County, through its final policymakers for training and use-of-force practices within the DeKalb County Police Department, maintained training, supervision, and retraining practices that were inadequate to ensure officers understood (a) the mechanisms and warning signs of positional asphyxiation, (b) training concerning the recognition of an individual's inability to breathe; (c) the need for immediate post-handcuff repositioning; (d) the need to monitor any detainee who is placed into a prone restraint position for any reason; and (e) the requirement to cease compression restraint and summon medical aid without delay upon obtaining compliance with a suspect.

130. The reason that Defendants Daniels and Byrd did not know that Mr. Pilici should not be placed stomach down in the back of a patrol car, with his hands cuffed behind his back, after he experienced difficulty breathing, is because DeKalb County failed to provide training to them on those subjects.

## Count IV

131. This count is against Defendant DeKalb County for negligence under Georgia law. It incorporates paragraphs 1 to 102, and 107 to 120.

132. DeKalb County purchased liability insurance that provides coverage for losses arising out of claims for the negligent use of a covered motor vehicle that was in effect at the time of Mr. Pilici's death.

133. DeKalb County owned the vehicle used by Defendant Daniels.

134. DeKalb County purchased liability insurance for the vehicle's use.

135. Defendant Daniels used his vehicle to detain Mr. Pilici.

136. Defendant Daniels' vehicle was designed to be used as a place to detain individuals who have been placed in custody.

137. Plaintiff timely provided a timely ante litem notice to DeKalb County concerning a claim for negligence under Georgia law. That ante litem notice complied with all prerequisites under Georgia law.

138. DeKalb County is sued as the responsible party for the negligent use of a police vehicle. Its sovereign immunity is waived under O.C.G.A. §§ 33-24-51 and 36-92-2.

139. Defendants Daniels' and Byrd's decision to load Mr. Pilici into the vehicle and detain him in a prone position in the backseat of Daniels's vehicle was negligent.

140. Additionally, Defendants Daniels' and Byrd's failure to check on Mr. Pilici while he was prone in the back seat was negligent.

141. As a result of Defendants' negligent use of the DeKalb County patrol vehicle, Mr. Pilici died.

<u>Count V</u>

142. This count is alleged against Defendant DeKalb County under O.C.G.A. § 13-6-11.

143. Defendant DeKalb County is liable for attorney's fees and expenses, in an amount to be determined by the jury, as a result of bad faith, stubborn litigiousness, and causing Plaintiff unnecessary trouble and expense.

<u>Count VI</u>

144. This count is alleged against Defendant Lisa Guest in her individual capacity under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution. This count incorporates paragraphs 1 to 102.

145. At the time Mr. Pilici was placed in the back of Defendant Daniels' patrol car, Defendant Guest had observed Defendant Daniels restraining Mr. Pilici

for approximately eight minutes by pinning Mr. Pilici to the ground and exerting pressure on Mr. Pilici's back and neck.

146. At the time Mr. Pilici was placed in the back of Defendant Daniels' patrol car, Defendant Guest heard and observed Mr. Pilici struggling to breathe.

147. At the time Mr. Pilici was placed in the back of Defendant Daniels' patrol car, Defendant Guest observed that Mr. Pilici was unable to walk under his own power and had collapsed to the ground while being escorted from his home.

148. Defendant Guest observed Defendants Daniels and Byrd place Mr. Pilici in the back of the patrol car by placing Mr. Pilici face-down with his hands cuffed behind his back, and with his breathing further obstructed by the car seat.

149. Defendant Guest knew from her previous training—specifically training she previously received while employed by the Fulton County Sheriff's Office and by NaphCare, a company that provides medical care in correctional facilities—that restraining someone in a prone position creates a significant risk of positional asphyxiation.

150. Defendant Guest knew that Mr. Pilici had progressed from being responsive and animated after her arrival to being completely unresponsive by the time he was placed in the patrol car.

151. Defendant Guest was seated in the front seat of the patrol car while Mr. Pilici was restrained in the back seat.

152. Despite knowing Mr. Pilici's urgent need for medical treatment, and despite knowing that Mr. Pilici was placed in a position that greatly increased the likelihood of asphyxiation, Defendant Guest never looked in the rear seat, spoke to Mr. Pilici, or did anything whatsoever to ensure that he could breathe.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks this Court to:

a. Assume jurisdiction over this matter;

b. Provide for a jury trial upon all claims and issues so triable;

c. Award Plaintiff nominal, compensatory, and special damages against each Defendant in an amount to be proven at trial;

d. Award punitive damages against Defendant Daniels, Byrd, and Guest in an amount to be proven at trial;

e.  Award Plaintiff attorney's fees and costs of litigation against each Defendant under 42 U.S.C. § 1988;

f.  Award Plaintiff attorney's fees and expenses against Defendant DeKalb County under O.C.G.A. § 13-6-11;

g.  Award such other relief to which Plaintiff is entitled either at law or in equity, whether explicitly pleaded or not.

Submitted on February 9, 2026.

**Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

**Wingo F. Smith**
Wingo F. Smith
Georgia Bar No. 147896

FILIPOVITS & SMITH, LLC
315 W. Ponce de Leon Ave., Ste. 865
Decatur, Georgia 30030
404-905-2225
jeff@civil-rights.law
wingo@civil-rights.law

**William Dixon James**
William Dixon James
Georgia Bar No. 003989

WM. DIXON JAMES, P.C.
One Decatur Town Center
150 East Ponce de Leon Avenue
Suite 260
Decatur, Georgia 30030
(404) 373-0072
DixonJames@DixonJamesLaw.com